IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MICHAEL ANTHONY ARCHULETA,<br><br>                      Petitioner,<br>v.<br><br>SCOTT CROWTHER, Warden, Utah State Prison,<br><br>                      Respondent. | Order Granting Motion to Stay<br><br>Case No. 2:07-CV-630<br><br>Judge Tena Campbell |

      Petitioner Michael Anthony Archuleta, a state prisoner, filed a petition under 28 U.S.C. §2254 for habeas corpus relief based on a number of claims, the first of which is the claim that he should be exempt from the death penalty pursuant to Atkins v. Virginia, 536 U.S. 304 (2002), which forbids the execution of persons with intellectual disabilities[1] under the Eighth and Fourteenth Amendments. "Because of their disabilities in areas of reasoning, judgment, and control of their impulses, . . . they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against [intellectually disabled] defendants." Id. at 306.

      Mr. Archuleta's claim that he is intellectually disabled has not been addressed in Utah state court.

      Mr. Archuleta asked the court to stay his petition pursuant to Rhines v. Weber, 544 U.S. 269 (2005), so that he can return to state court with the Atkins issue.

---

[1] Atkins uses the term "mental retardation," but Hall v. Florida, 134 S. Ct. 1986 (2014), notes that it adopts and uses the term "intellectual disability" to describe the same condition. Likewise, the court will use "intellectual disability."

Respondent Scott Crowther[2] concedes that the claim has not been exhausted, but opposes the motion, arguing that Mr. Archuleta cannot meet the threshold requirements for a Rhines stay and that, even if he could, he would not have a remedy for his Atkins claim in state court.

## I.    Procedural History

Mr. Archuleta was convicted of criminal homicide on December 15, 1989, for the murder of Gordon Ray Church with Co-Defendant Lance Conway Wood.[3]  The jury unanimously returned a verdict of death for Mr. Archuleta on December 20, 1989, and a sentence of death was imposed the next day.  On direct appeal, the Utah Supreme Court affirmed Mr. Archuleta's conviction and the imposition of the death penalty.  See State v. Archuleta, 850 P.2d 1232 (Utah 1993), cert. denied, 510 U.S. 979 (1993).

Following what was then the common law tradition of habeas relief in Utah, Mr. Archuleta filed a petition for a writ of habeas corpus with the trial court on March 10, 1994.  An amended petition, prepared with the assistance of pro bono counsel, was filed on August 11, 1994.

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) on April 24, 1996.  The statute was designed to "further the principles of comity, finality, and federalism."  Miller-El v. Cockrell, 537 U.S. 322, 337 (2003).

Five days later, on April 29, 1996, Utah's Post-Conviction Relief Act (PCRA) became effective, and it "applies only to post-conviction proceedings filed on or after July 1, 1996."  Utah Code Ann. § 78B-9-103.

On October 4, 1996, the trial court granted the state's motion to dismiss the petition, but the order was not entered until November 18, 1996.  On appeal, the Supreme Court of Utah

---

[2] Mr. Crowther is the named respondent for the State of Utah, and the court will refer to him as "the state."

[3] Mr. Wood was tried separately, found guilty, and given a life sentence.

2

reversed the trial court's decision for error on August 14, 1998, finding that Mr. Archuleta had a Sixth Amendment right to pursue claims of ineffective assistance of counsel against his trial and appellate lawyers, and his petition was remanded for further proceedings. See Archuleta v. Galetka, 960 P.2d 399 (Utah 1998).

The habeas court ordered Mr. Archuleta to file a second amended petition for habeas corpus relief on March 20, 2001. Before that date was reached, one of Mr. Archuleta's lawyers, the one who was capital-qualified and lived in Colorado, suffered from an illness that resulted in her absence from the case. (PCR ROA 622-48.) The habeas court allowed Mr. Archuleta's other pro bono lawyer to withdraw because he was not qualified under Utah law to continue as counsel in a capital appeal. (PCR ROA 706.)

New counsel, Edward Brass, was appointed in July 2001, and two other lawyers, McCaye Christianson and L. Clark Donaldson, entered appearances in August 2001. The court set a deadline of February 1, 2002, for the filing of a second amended petition.

In light of the difficulties[4] new counsel faced, the habeas court extended the deadline for the second amended petition again to June 14, 2002, and it was timely filed.

Six days later, on June 20, 2002, the United States Supreme Court issued its Atkins decision, which changed the landscape of death penalty jurisprudence by categorically distinguishing individuals with intellectual disabilities from other adult criminals.

---

[4] Each of the lawyers was new to the case and did not receive the file from previous counsel, despite effort, until November 2001. (PCR ROA 741-46.) And, as of March 6, 2002, they had yet to be paid for their work on Mr. Archuleta's post-conviction case because the funds allocated for that purpose pursuant to Utah Administrative Code R25-14 had been disbursed to previous post-conviction counsel. Years later, when considering the Rule 11 sanctions filed against post-conviction counsel by the state, the Utah Supreme Court noted that "low levels of public funding for capital cases" threatened the integrity of the process and that "[i]t is the duty of the legislative branch to provide for adequate defense of capital defendants, including sufficient resources to attract, train, compensate, and support legal counsel." Archuleta v. Galetka, 197 P.3d 650, 654 (Utah 2008). "Competent defense and appellate counsel are guaranteed by our constitution." Id.

Mr. Archuleta's second amended petition for habeas relief in state court was not amended to include an Atkins claim.

The state launched a multi-pronged response to Mr. Archuleta's second amended petition for habeas relief.  First, on April 1, 2003, the state moved for summary judgment against all of Mr. Archuleta's claims.  Second, on February 19, 2004, it filed a motion to strike evidence in support of Mr. Archuleta's second amended petition.[5]  (PCR ROA 1811.)  Third, it served Mr. Archuleta's post-conviction counsel, Mr. Brass, Mr. Donaldson, and Ms. Christianson, with a proposed motion for sanctions on February 27, 2004, and filed an amended motion for sanctions against them with the habeas court on April 12, 2004.[6]  (PCR ROA 1973-78, 1986-2008.)

Against this backdrop, the habeas court granted the state's motion for summary judgment against Mr. Archuleta on August 24, 2004, for all but two claims.[7]

The habeas court held an evidentiary hearing on the remaining claims before ultimately denying them on January 22, 2007.  (PCR ROA 3338-36.)  The order was entered on February 26, 2007.  (PCR ROA 3379-81.)

Mr. Archuleta filed a notice of appeal with the Utah Supreme Court on March 20, 2007.

On February 1, 2008, Mr. Brass moved to withdraw from the case.[8]  (PCR ROA 3685-98.)  Mr. Brass argued that Mr. Archuleta's post-conviction representation had been harmed by

---

[5] By then, the habeas court had permitted Ms. Christianson and Mr. Donaldson to withdraw from the case for "good cause" on March 1, 2004.  (PCR ROA 1969.)  Their motions to withdraw, filed on January 22, 2004, reflect that they had not been compensated for any of their work on Mr. Archuleta's case.  (PCR ROA 1798-1803.)

[6] The state pursued its action for sanctions against Mr. Archuleta's counsel with active and aggressive litigation for almost three years before the habeas court denied its motion on February 23, 2007.  (PCR ROA 3382.)  Despite the habeas court's detailed order denying the state's motion for sanctions, as well as counsel's cross-motion for sanctions, the state immediately filed a notice of appeal with the Utah Supreme Court on March 9, 2007.  (PCR ROA 3407.) The Utah Supreme Court ruled against the state and affirmed the habeas court's decision.  It instructed future trial courts faced with Rule 11 motions in capital cases to stay proceedings on those motions until the underlying capital matters are resolved to avoid increased delay, expense, and complexity for the court and parties. See Archuleta v. Galetka, 197 P.3d 650, 653 (Utah 2008).

[7] Claims 33(d)-(t) and 35(o)-(z) were left standing.

4

the State's decision to litigate and appeal Rule 11 sanctions against him, and that Mr. Brass could not provide zealous advocacy for Mr. Archuleta because he was defending himself against the state's Rule 11 motion, which created a conflict of interest.[9] Mr. Brass also noted that financial restrictions plagued Mr. Archuleta's representation.

The Utah Supreme Court granted Mr. Brass's request to withdraw on June 6, 2008, and temporarily remanded the case to the trial court for the appointment of new counsel.

James Slavens was appointed to represent Mr. Archuleta on August 27, 2008. (60(b) ROA 3438, 5263.)

On November 7, 2008, the Utah Supreme Court denied the state's appeal of the habeas court's Rule 11 decision. See Archuleta v. Galetka, 197 P.3d 650 (Utah 2008). Significantly, the court found that "[t]he moment allegations of a personal violation are filed against capital defense counsel, the interests of attorney and client diverge. The attorney is required to invest time and resources in his or her own defense in the rule 11 matter. An attorney's rule 11 defense may also require disclosure of strategy or communications that constitute a possible breach of the confidentiality between attorney and client." Id. at 653.

On July 17, 2009, while Mr. Archuleta's appeal from the habeas decision was still pending before the Utah Supreme Court, Mr. Slavens asked the trial court to set aside its judgment denying habeas relief and/or grant Mr. Archuleta a new trial because of Mr. Brass's ineffective assistance of counsel during the post-conviction proceedings. The motion was filed

---

[8] Mr. Brass moved to withdraw twice before, on October 28, 2005, and March 16, 2006, but the trial court denied his requests. The court denied the October 28, 2005 request because it did not see any deficiency and Mr. Archuleta had not requested the withdrawal. Even though Mr. Archuleta did not request the removal of Mr. Brass, he was not pleased with Mr. Brass's representation, and sent letters to the court with concerns about Mr. Brass on February 28, 2005, March 4, 2005, and October 11, 2005. (PCR ROA 2421-22, 2487-88, 2629-32.) The record also reflects that Mr. Archuleta had assistance with the third letter because he could not write it on his own.

[9] Despite making this argument in his March 16, 2006 motion to withdraw, the trial court nevertheless denied the motion during a telephonic conference the next day. (PCR ROA 2742.)

pursuant to Rule 59, Rule 60(b), and Rule 65(c) of the Utah Rules of Civil Procedure, as well as the Sixth and Fourteenth Amendments to the Constitution of the United States. (60(b) ROA 3505-61.) It was in this motion, which alleged Mr. Brass's ineffective assistance of counsel during the post-conviction process, that an Atkins claim was included on Mr. Archuleta's behalf for the first time. (Id. at 3509.) But the Atkins issue was not cast as a stand-alone claim.

The trial court held oral arguments on the Rule 60(b) motion before denying it on April 21, 2010. (60(b) ROA 4896-4980.)

Mr. Archuleta appealed the Rule 60(b) decision to the Utah Supreme Court. (60(b) ROA 5319-21.)

The Utah Supreme Court denied both appeals. Archuleta v. Galetka, 267 P.3d 232 (Utah 2011). Because the Court found that Mr. Brass's "performance was nowhere near the level that he stooped to in Menzies [v. Galetka, 150 P.3d 480 (Utah 2006)]," where he "willfully abdicated his role as advocate," and "abandoned the required duty of loyalty to this client," the Court concluded that his representation of Mr. Archuleta was not bad enough to be the kind of "egregious lawyer misconduct" that would justify setting aside the post-conviction case pursuant to Rule 60(b).[10] Id. at 273-77. As a result, the court "decline[d] to individually examine each of Archuleta's claims that his habeas counsel rendered ineffective assistance." Id. at 277. The Atkins claim was one of those claims that the Utah Supreme Court declined to address.

---

[10] Of course saying that Mr. Brass's representation was not bad enough to set aside everything that he did for Mr. Archuleta under Rule 60(b)(6), is not the same as finding that Mr. Archuleta had constitutionally sufficient counsel. In the Menzies case, Mr. Brass filed an affidavit stating that he was not competent to represent a capital post-conviction petitioner without counsel. There is no reason to believe that Mr. Brass's abilities with regard to his representation of Mr. Archuleta during the same time period were any different.

## II.   Applicable Law

### A.   Rhines Analysis

Barring "unusual" and "exceptional" circumstances, federal courts should not consider claims that have not been exhausted in state court. See Rose v. Lundy, 455 U.S. 509, 515 (1982). This rule reflects a long-standing federal court commitment to comity and allowing state courts to address constitutional claims first, and it also means that ideally federal review of the claims will have the benefit of a complete factual record. Id. at 519-20.

More pragmatically, the exhaustion requirement provides "a simple and clear instruction to potential litigants:  before you bring any claims to federal court, be sure that you first have taken each one to state court." Id. at 520. With these principles in mind, Lundy held that a federal court faced with a "mixed petition," one that contained exhausted and unexhausted claims, could either dismiss the petition, or allow the petitioner to amend the petition and remove the unexhausted claims.

Under AEDPA, no court may grant an application for habeas relief unless the claims have been exhausted in state court or either there is no state process available or that process is ineffective to protect the rights of the applicant. 28 U.S.C. § 2254 (b)(1). "The federal habeas scheme leaves primary responsibility with the state courts . . . ." Woodford v. Visciotti, 537 U.S. 19, 27 (2002). State court decisions are deemed to be presumptively valid, and any petition for federal review of them must be filed within one year.

"As a result of the interplay between AEDPA's 1-year statute of limitations and Lundy's dismissal requirement, petitioners who come to federal court with 'mixed' petitions run the risk of forever losing their opportunity for any federal review of their unexhausted claims." Rhines v. Weber, 544 U.S. 269, 274 (2005). To prevent this outcome, courts may stay the federal case

and allow the petitioner, in limited circumstances, to return to state court with any unexhausted claims because "the petitioner's interest in obtaining federal review of his claims outweighs the competing interests in finality and speedy resolution of federal petitions." Id. at 278.

A stay under Rhines creates tension between AEDPA's goals of federalism and comity and its goal of finality and streamlining the habeas process. For those reasons, any stay under Rhines cannot be indefinite and must meet certain criteria. The petitioner must have (1) good cause for his failure to exhaust, (2) his unexhausted claims must be potentially meritorious, and (3) there must no indication of intentional delay tactics. See id. When a petitioner can meet these threshold issues, "it likely would be an abuse of discretion for a district court to deny a stay." Id.

The first question, then, is whether Mr. Archuleta had good cause for his failure to exhaust his Atkins claim in state court. Mr. Archuleta argues that the ineffective assistance by Mr. Brass and/or Mr. Slavens during his post-conviction proceedings in state court constitutes good cause for his failure to exhaust. The state disagrees.

The Rhines decision did not explain the "good cause" standard with any precision, but in a decision on month later, the United States Supreme Court stated that "[a] petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' to excuse his failure to exhaust." Pace v. DiGuglielmo, 544 U.S. 408, 416 (2005).

Since 2005, district courts have reached different conclusions about whether good cause in the Rhines context is akin to good cause to excuse a procedural default in federal court (which is set as a high standard because it would allow the district court to consider the merits of a defaulted claim) or a more expansive and equitable reading of good cause (which would allow the claim to return to state court for merits review). Compare Hernandez v. Sullivan, 397 F.

8

Supp. 2d 1205, 1207 (C.D. Cal. 2005) (courts should look to procedural default law to determine cause), with Rhines v. Weber, 408 F. Supp. 2d 844, 849 (D.S.D. 2005) (Rhines II) (rejecting procedural default analysis for cause in exhaustion context). Based in part on those different standards, some district courts have concluded that ineffective assistance of post-conviction counsel constitutes good cause for failure to exhaust. See, e.g., Vasquez v. Parrott, 397 F. Supp. 2d 452, 464-65 (S.D.N.Y. 2005); see also Rhines II. Others, including another court in this district, have concluded the opposite. See, e.g., Carter v. Friel, 415 F.Supp.2d 1314 (D.Utah 2006).

But the only circuit court to address these two issues directly is the Ninth Circuit.[11] In Blake v. Baker, 745 F.3d 977 (9th Cir. 2014), the Ninth Circuit followed the reasoning in Pace and Rhines II to find that good cause for a Rhines stay cannot be any more demanding than a showing of cause for procedural default under Martinez v. Ryan, 132 S. Ct. 1309 (2012), and, in fact, may be less demanding. "The Supreme Court's statement in Pace . . . suggests that the good cause standard is, indeed, lesser than the cause standard discussed in Coleman [v. Thompson, 501 U.S. 722 (1991)] and applied in Martinez." Blake, 745 F.3d at 984 n.7.

The Blake court held that ineffective assistance of state post-conviction counsel can establish good cause for failure to exhaust. "While a bald assertion [of ineffective assistance of post-conviction counsel] cannot amount to a showing of good cause, a reasonable excuse, supported by evidence to justify a petitioner's failure to exhaust, will." Blake, 745 F.3d at 982.

The Ninth Circuit found, and the court agrees, that the good cause standard is grounded in equitable considerations to ensure that a stay and abeyance "is available only to those

---

[11] The Tenth Circuit has not addressed this issue but its jurisprudence suggests that it would view the "good cause" standard within a tradition of equitable discretion of Pace. In Fairchild v. Workman, 579 F.3d 1134, 1152-54 (10th Cir. 2009), the Tenth Circuit cited the "reasonable confusion" standard from Pace, as well as the equitable reasoning in Lundy and Rhines, with approval. "In this connection, we acknowledge that the good cause requirement should not be 'the sort of strict and inflexible requirement that would trap the unwary pro se prisoner.'" Id. at 1154.

9

petitioners who have a legitimate reason for failing to exhaust a claim in state court. As such, good cause turns on whether the petitioner can set forth a reasonable excuse, supported by sufficient evidence to justify that failure." Id.

But more than that, the Ninth Circuit analysis in Blake also provides an answer to those district courts, including the Hernandez court, that set a very high bar for "good cause" out of the hypothetical concern that, without it, Rhines stays will be granted routinely in almost every case. The court finds the analysis of Blake and Rhines II to be better reasoned than the analysis followed by Hernandez and Carter:

> [T]his concern does not require limiting the definition of good cause to only those excuses that arise infrequently. Factors (2) and (3) of the Rhines test itself—that the "unexhausted claims are potentially meritorious," and that "there is no indication that the petitioner engaged in intentionally dilatory litigation tactics,"—are designed, together with the first factor, to ensure that the Rhines stay and abeyance is not, contrary to the district court's concern, available "in virtually every case."

Id. at 981-82 (citations omitted).

The Tenth Circuit has agreed with this analysis, finding, after quoting Blake with approval, that "the Rhines three-part test strictly limits the availability of a stay where a petitioner has not yet exhausted his state remedies." Doe v. Jones, 762 F.3d 1174, 1181 (10th Cir. 2014).

With that in mind, the court finds the following pursuant to Rhines:

Mr. Archuleta has offered a good cause for failing to exhaust his Atkins claim in state court: the ineffective assistance of post-conviction counsel.[12] To support his good cause

---

[12] The court need not defer to the Utah Supreme Court's findings regarding Mr. Brass's performance in Archuleta v. Galetka, 267 P.3d 232 (Utah 2011), because the analysis of his performance in that case went to whether or not his

argument, Mr. Archuleta points to the fact that his post-conviction counsel did not investigate and amend his second amended petition to include an Atkins claim, despite the fact that there were questions about Mr. Archuleta's intellectual ability and adaptive functioning, as well as his history of intellectual disability diagnoses.

Atkins, which was one of the most significant Supreme Court decisions during that term, was announced a mere six days after Mr. Archuleta's second amended petition was filed. Any reasonable and competent attorney knowing Mr. Archuleta's record would have investigated an Atkins claim and amended the petition so that there could be an evidentiary hearing on it. There is no evidence that Mr. Brass did so, and the court does not agree with the state's suggestion that the lack of such evidence means that Mr. Brass made a reasonable, informed, and strategic decision against an Atkins claim. Given everything else in the record before the court, the more reasonable conclusion is that Mr. Brass, by his own admission, was not competent to handle capital habeas appeals alone, which is what he was doing in Mr. Archuleta's case, and that, as discussed more below, he did not have the time or resources to pursue an Atkins claim on Mr. Archuleta's behalf.[13]

---

conduct was so extraordinary and egregious that it amounted to an abdication of representation such that Mr. Archuleta's entire post-conviction proceedings needed to be set aside pursuant to Rule 60(b). The Utah Supreme Court pointedly did not analyze whether, based on the facts in the record, Mr. Brass should have pursued an Atkins claim on Mr. Archuleta's behalf. It may well be true that, as a general matter, "[o]ccasional omitted claims do not constitute extraordinary or unusual circumstances sufficient to trigger the rule [of setting aside a judgment]." Id. at 276 n.14. But it is also true that based on the facts in Mr. Archuleta's case, the Atkins claim is not an occasional claim, Mr. Brass should have pursued it, and his failure to do so amounted to ineffective assistance of counsel.

[13] The context of Mr. Brass's representation of Mr. Archuleta informs the court's analysis. The state made Mr. Brass's job difficult. It attacked him personally through litigation sanctions that were ultimately found to be baseless, and it refused to properly fund his defense of Mr. Archuleta. By its actions, the state created a conflict of interest between Mr. Brass and his client that made it impossible for him to completely and reasonably represent Mr. Archuleta. That Mr. Brass had to defend himself against the state's Rule 11 sanctions at all, while trying to do a job that no other lawyer in the state was willing to do (in part because there was no funding) was an untenable situation. The Rule 11 sanctions were levied against Mr. Brass for pursuing claims on Mr. Archuleta's behalf that the state believed were unreasonable and unnecessary, despite the fact that Mr. Brass and his then-co-counsel believed otherwise. There is no way to understand the chilling effect that had on Mr. Brass's ability to zealously advocate for Mr. Archuleta and to include an Atkins claim in his post-conviction petition, but the state undoubtedly would have considered an Atkins claim to be unreasonable and unnecessary as well. But what the record does reflect is that

In addition, there is no evidence that Mr. Brass investigated a possible Atkins claim while preparing for the evidentiary hearing on mitigation issues, nor did Mr. Archuleta's other post-conviction counsel seek to amend the second amended petition after identifying the Atkins claim during the Rule 60(b)(6) litigation. These failings provide a sufficient showing that Mr. Archuleta's state post-conviction representation was defective under Strickland v. Washington, 466 U.S. 668, 687 (1984).[14]

Although the court declines to decide the merits of Mr. Archuleta's Atkins claim at this point, it finds, based on the expert report that Mr. Archuleta supplied with his motion, as well as the state court record as discussed more below, that Mr. Archuleta's claim is potentially meritorious and not plainly meritless. This is a conclusion limited to the specific facts in Mr. Archuleta's case, which show that, in addition to the more recent determination about the potential validity of Mr. Archuleta's intellectual disability, there were questions about his intellectual ability and adaptive functioning from an early age that were not fully addressed during trial, or even during the later evidentiary hearing, in an Atkins context.

There is no evidence before the court of intentionally dilatory litigation tactics. Mr. Archuleta's Atkins claim was not raised in his second amended post-conviction petition because

---

there were claims left unaddressed due to lack of time and resources. (PCR ROA 2042.) To investigate and add an Atkins claim in this context, assuming Mr. Brass thought about doing so, would have required Mr. Brass to pay for an expert analysis while not being paid for his own time and to open himself up to additional Rule 11 sanctions. That conflict alone meant that Mr. Brass could not have competently represented Mr. Archuleta.

[14]The state argues that ineffective assistance of post-conviction counsel will not establish cause for failure to exhaust his claim under the PCRA because the 2008 amendments also eliminated the ability of petitioners to bring claims of ineffective assistance of post-conviction counsel in a capital case. See Utah Code Ann. §78B-9-202(4). This amendment was made in response to the Utah Supreme Court's decision in Menzies v. Galetka, 150 P.3d 480 (Utah 2006), which found Mr. Brass's representation of Mr. Menzies constituted ineffective assistance of counsel and that Mr. Menzies should be given an opportunity to investigate certain claims and file an amended post-conviction petition. Based on the Menzies decision, and the 2008 Amendments, Mr. Archuleta arguably was entitled to effective assistance of post-conviction counsel between 1996 and 2008. Moreover, it is not clear that Utah Code Ann. §78B-9-202(4) is good law as applied to Atkins proceedings after the Tenth Circuit's decision in Hooks v. Workman, 689 F.3d 1148 (10th Cir. 2012), which found that defendants in Atkins proceedings, even if "post-conviction," have the right to effective assistance of counsel secured by the Sixth and Fourteenth Amendments.

he had ineffective assistance of counsel who had an impermissible conflict of interest with him. When Mr. Archuleta's other post-conviction lawyer did raise the Atkins issue in state court, it was not raised as a stand-alone claim, and it was not addressed by the Utah Supreme Court. Mr. Archuleta appropriately raised the Atkins claim as his first claim in his petition for habeas corpus pending before the court, and he immediately sought an order for a stay of proceedings to present the issue to the state courts for an evidentiary hearing.

  B. Atkins Analysis

Like its landmark decisions in Ford v. Wainwright, 477 U.S. 399 (1986), which prohibits the execution of individuals who are insane, and Roper v. Simmons, 543 U.S. 551 (2005), which prohibits the execution of individuals who were under eighteen years of age at the time of their capital crimes, the United States Supreme Court in Atkins v. Virginia, 536 U.S. 304 (2002), held that the Eighth and Fourteenth Amendments prohibit the execution of another class of individuals: individuals with intellectual disabilities. The Supreme Court found that intellectually disabled persons "frequently know the difference between right and wrong and are competent to stand trial" but "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Atkins, 576 U.S. at 318. Those "deficiencies do not warrant an exemption from criminal sanctions, but they do diminish [a defendant's] personal culpability." Id.

In addition to finding that the retributive and deterrent aims of capital punishment cannot apply to those with intellectual disabilities, the Supreme Court found in Atkins that the "reduced capacity" of persons with intellectual disabilities created the impermissible "risk 'that the death penalty will be imposed in spite of factors which may call for a less severe penalty'" because

they have a diminished ability "to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors." Id. at 320 (citations omitted). "[R]eliance on [intellectual disability] can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury. [Intellectually disabled] defendants in the aggregate face a special risk of wrongful execution." Id. at 321 (citations omitted).

There is no national definition of what it means to be intellectually disabled. Atkins, like Ford, deferred to the states to develop standards that ensure persons with intellectual disability, like persons who are incompetent, are not executed. Id. at 317. But in Hall v. Florida, 134 S. Ct. 1986 (2014), the Supreme Court found that Florida's rigid rule defining intellectual disability as an IQ of 70 or lower, without a further exploration of adaptive functioning, was unconstitutional because it suggested that intellectual functioning can be reduced to a single numerical score that was unaffected by a test's "standard error of measurement." Id. at 1995. "Intellectual disability is a condition, not a number." Id. at 2001.

Utah codified the holding in Atkins by creating an exemption from the death penalty for persons who have intellectual disabilities. See Utah Code Ann. § 77-15a-101 to -106. Unlike Florida's statute, Utah's statute defines intellectual disability[15] as "significant subaverage general intellectual function that results in and exists concurrently with significant deficiencies in adaptive functioning that exist primarily in the areas of reason or impulse control, or in both of these areas" provided that both are manifested before twenty-two years of age. See Utah Code Ann. §77-15-a-102.

---

[15] Utah's statute uses the phrase "mental retardation" but for consistency in the order, and recognizing that the phrases refer to the same status, the court substitutes "intellectual disability."

Mr. Archuleta may or may not be intellectually disabled within the meaning of Utah's statute, "but the law requires that he have the opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning over his lifetime." Hall, 134 S.Ct. at 2001. "The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution." Id.

The state argues that Mr. Archuleta already had that opportunity. Because Mr. Archuleta's post-conviction counsel failed to raise the issue of his intellectual disability at what the state believes was the appropriate post-conviction moment in state court, the state argues that his Atkins claim may not be considered by the state courts, or even by this court, because the state courts, pursuant to Utah's PCRA, will find that Mr. Archuleta's claim is time barred and procedurally barred.[16] (Docket No. 80 at 30-38.)

The Utah Supreme Court may agree with that position. It may not. But this court finds that the interests in federalism and comity require that the state courts have the opportunity to make that decision. "Whether a state remedy is presently available is a question of state law as to which only the state courts may speak with final authority." Simpson v. Camper, 927 F.3d 392, 393 (8th Cir. 1991). "[A] federal court always must be chary about reaching a conclusion, based upon a speculative analysis of what a state court might do, that a particular claim is procedurally foreclosed." Pike v. Guarino, 492 F.3d 61, 74 (1st Cir. 2007).

---

[16] The state cites to Thomas v. Gibson, 218 F.3d 1213, 1221 (10th Cir. 2000), and Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991), to support its claim that Mr. Archuleta's Atkins claim, since it was not exhausted in state court, is deemed exhausted and defaulted from federal review because it will be procedurally barred by the state courts under the PCRA. (Docket No. 96 at 5-7.) At this point the court is not undertaking a federal review of Mr. Archuleta's Atkins claim, and therefore Thomas and Coleman are inapposite. Neither Thomas nor Coleman circumscribe this court's discretion to issue a stay, or its consideration of whether state or federal court is the best forum for an evidentiary hearing on Mr. Archuleta's Atkins claim. Moreover, both Thomas and Coleman are cases that address challenges to the state criminal justice system, and both were decided before Atkins. Mr. Archuleta's Atkins claim is not a challenge to the state criminal system that convicted and sentenced him. It does however, point to the limitations of the state's post-conviction process.

That is especially important where, as here, it is not clear that the PCRA, which is "the sole remedy for any person who challenges a conviction or sentence" necessarily applies to a determination of his intellectual disability status pursuant to Atkins. See Utah Code Ann. § 78B-9-102. The Atkins claim "is 'post-conviction' only in the strict chronological sense: Atkins was handed down in 2002, after [Mr. Archuleta] had been convicted in 1989." Hooks v. Workman, 689 F.3d 1148, 1183 (10th Cir. 2012).

Most of the claims in Mr. Archuleta's federal habeas petition focus on what happened at the trial and appellate stages, and request federal review of the state court proceedings where the jury found him guilty and sentenced him to death. AEDPA appropriately circumscribes the federal court's ability to review such claims for a variety of reasons, not the least of which is the presumption of a valid state conviction and sentence. See Ryan v. Gonzales, 133 S. Ct. 696, 709 (2013). Federal habeas review exists as a civil remedy only as a "guard against extreme malfunctions in the state criminal justice system." Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011) (citations omitted).

Mr. Archuleta's Atkins claim is fundamentally different than his other claims. It argues that, regardless of the process by which he was convicted and sentenced, regardless of the state appellate and post-conviction review process, the Eighth Amendment prohibits the death penalty for persons with intellectual disability, and that he is intellectually disabled. Mr. Archuleta has presented the court with evidence that he is intellectually disabled. (See Docket No. 75, Ex. A.) The state does not contest this evidence except to say that Mr. Archuleta should have submitted it sooner and that other experts have reached different conclusions.

16

That one of the experts during the 2006 hearing opined that Mr. Archuleta's "test data" does not support a finding of intellectual disability is not dispositive.[17]  Indeed, what the record before the court shows is that there is a question of fact as to Mr. Archuleta's intellectual ability that must be answered.  Evidence on this issue from the penalty phase in 1989, as well as during the evidentiary hearing on mitigation issues in 2006, makes it clear that there have been questions about Mr. Archuleta's intellectual ability and his adaptive functioning for most of his life.

The issue before the court is whether those questions are best answered in federal court or state court.  The court considers that issue within the overall context of Mr. Archuleta's case as a capital case in federal court for habeas review, keeping in mind that the Tenth Circuit has found that resolution of an Atkins claim "is 'part of the criminal proceeding itself' and not 'civil in nature.'"  Hooks, 689 F.3d at 1184.

The state worries about the court's intrusion into its interest in finality and deference to the trail court's decisions.  But the state's interest in finality, in executing Mr. Archuleta, must be counterbalanced by the state's interest in carrying out only those executions that are constitutionally permissible.  Whether Mr. Archuleta has an intellectual disability must be addressed pursuant to Atkins before the state is in a position to execute Mr. Archuleta.  Given the time and resources the parties have already invested in litigating Mr. Archuleta's case, the open question about his intellectual ability, and the goals of AEDPA, it is not an abuse of discretion for the district court to stay the case and send the Atkins issue back to state court.

---

[17] The state suggests that Dr. Gummow's testimony is sufficient in this regard. It is not. Dr. Gummow testified that intellectual disability "is based usually on an IQ test" and "I don't see any evidence from the—from the actual test data that he was [intellectually disabled] . . . ." (May 17, 2006 Evidentiary Hearing Transcript, 94:23-95:24.) While IQ scores are a significant part of an analysis of intellectual disability, they must be considered along with an assessment of adaptive functioning.  See Hall v. Florida, 134 S. Ct. 1986, 1994 (2014).

Atkins claims, like claims of incompetency pursuant to Ford v. Wainwright, 477 U.S. 399 (1986), can be raised at any time they are ripe.

> Prior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition. Under Ford, once a prisoner makes the requisite preliminary showing that his current mental state would bar his execution, the Eighth Amendment, applicable to the States under the Due Process Clause of the Fourteenth Amendment, entitles him to an adjudication to determine his condition.

Panetti v. Quarterman, 552 U.S. 930, 934-5 (2007).

Mr. Archuleta, by and through his motion, has made the preliminary showing that he is intellectually disabled and is entitled to an adjudication of his condition. In Panetti, when faced with a question about a petitioner's mental status and competence, the Supreme Court found that AEDPA did not bar a second or successive federal habeas petition filed to address those issues, and directed the district court to hold an evidentiary hearing on Panetti's claims that he was incompetent to be executed. "It is proper to allow the court charged with overseeing the development of the evidentiary record in this case the initial opportunity to resolve petitioner's constitutional claims. These issues may be resolved in the first instance by the District Court." Id. at 962. Those principles are likewise applicable to Mr. Archuleta's Atkins claim. Indeed, in Hooks, 689 F.3d at 1162, the Tenth Circuit allowed the petitioner to file a second, or successive habeas petition to address his Atkins claims.[18]

Post-AEDPA, the court charged with overseeing the evidentiary record in Mr. Archuleta's case is a state court. Although it may well be within the court's discretion to address

---

[18] Mr. Hooks was convicted in 1989 and did not have his Atkins claim considered by a state court until 2004 after he filed a second petition for post-conviction relief in Oklahoma state court and received a stay in his federal habeas case until the resolution of the Atkins claim in state court. See Hooks, 689 F.3d at 1162. The Tenth Circuit cited Martinez v. Ryan, 132 S. Ct. 1309, 1317 (2012), to note that Mr. Hooks' Atkins trial was "the first designated proceeding" at which Mr. Hooks could raise a claim of intellectual disability. See Hooks, 689 F.3d at 1183.

18

Mr. Archuleta's <u>Atkins</u> status, and an evidentiary hearing in federal court remains a possibility if there is no state court forum for Mr. Archuleta, Mr. Archuleta has requested that his <u>Atkins</u> claim be addressed first in state court.[19]

Mr. Archuleta has a constitutional right not to be executed if he is intellectually disabled. No court has ever made a determination about his intellectual disability. The court is "hard-pressed to imagine a more 'significant consequence[]' for [Mr. Archuleta] than a determination of whether the state has the power to take his life." <u>Hooks</u>, 689 F.3d at 1184. To the extent that the State of Utah is committed to ensuring that Mr. Archuleta's sentence of death is constitutionally permissible, the court trusts that it will find a way to address Mr. Archuleta's <u>Atkins</u> claim. "The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects." <u>Hall</u>, 134 S. Ct. at 2001. Moreover, "[o]nce a substantive right or restriction is recognized in the Constitution, . . . its enforcement is in no way confined to the rudimentary process" that preceded it. <u>Ford</u>, 477 U.S. at 410.

### III.  Conclusion

Mr. Archuleta's motion for a limited stay and abeyance of his petition is granted. Mr. Archuleta must commence his <u>Atkins</u> proceedings in state court within thirty days of this order,

---

[19] Since 2008, when the Utah Legislature amended the PCRA to "extinguish" common law exceptions in <u>Hurst v. Cook</u>, 771 P.2d 1029, 1037 (Utah 1989), to the procedural bar rule, the PCRA has held itself out as "the sole remedy for any person who challenges a conviction or sentence for a criminal offense" Utah Code Ann. § 78B-9-102(1). Among other things, Utah courts can no longer "excuse a petitioner's failure to file" where "the interests of justice require." <u>See</u> <u>Gardner v. State</u>, 234 P.3d 1115, 1145 (Utah 2010). The Utah Supreme Court has noted on more than one occasion "that [the 2008] amendments 'appear[] to have extinguished our common law writ authority.'" <u>Id.</u> at 1145 (citation omitted); <u>see also</u> <u>Taylor v. State</u>, 270 P.3d 471, 476 n.3 (Utah 2012). But if the PCRA truly is the sole remedy available to Mr. Archuleta to bring his <u>Atkins</u> claim in Utah courts, without exception, and his <u>Atkins</u> claim is barred by its terms, then the PCRA may violate not only the Utah Constitution, which, in Article I, Section 5, provides that "[t]he privilege of the writ of habeas corpus shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it" but also the United States Constitution, which, in Article I, Section 9, provides "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended unless when in Cases of Rebellion or Invasion the public Safety may require it."

and he shall provide the court with status updates every three months.  Mr. Archuleta must notify the court immediately upon the resolution of the state court <u>Atkins</u> proceedings.

Pursuant to the Sixth and Fourteenth Amendments, there is a right to counsel during <u>Atkins</u> proceedings.  <u>See</u> <u>Hooks</u>, 689 F.3d at 1184-85.  Accordingly, Mr. Archuleta's federal counsel has leave to petition the state courts to represent Mr. Archuleta in the <u>Atkins</u> proceedings before them.

SO ORDERED this 12th day of November, 2014.

BY THE COURT:

_____
Tena Campbell
United States District Judge